## THE SEABOARD OIL COMPANY
### vs.
## HARRY H. WILLIAMSON, ET AL.

Superior Court          Fairfield County          File #46802

Present:   Hon. CARL FOSTER, Judge.

Lavery & Finklestone,          Attorneys for the Plaintiff.
Chatfield & Shaff,          Attorneys for the Defendant.

**MEMORANDUM FILED FEBRUARY 26, 1935.**

FOSTER, J.   On October 8th, 1927 Harry H. Williamson was the owner of a certain tract of land situated in the town of Fairfield and bounded and described as follows:

NORTH on the southerly boundary of the Post Road Cut-off, 142 feet more or less:

EAST on land now or formerly of Levy Turney, 65 feet, more or less;

SOUTH on land now or formerly of Andrew Johnson, 118 feet, more or less;

WEST on Belmont Street, a proposed street, 101 feet, more or less.

Being known and designated on map of building lots of William H. Fox, on file in the Town Clerk's office of said Fairfield, as lot #19 and that part of lot #20 which lies southerly of the southerly boundary of the Post Road Cut-off.

On that day, by written lease (Exhibit A), Harry H. Williamson leased this land unto Louis H. Serre and Daniel I. McNamara.   Later, Harry H. Williamson conveyed all of his interest in this land unto the defendant, The Williamson-Brooks Company (to whom reference is hereinafter made as the defendant), and Louis H. Serre and Daniel I. McNamara conveyed all of their interest in this land unto the plaintiff, The Seaboard Oil Company.   By consent of all of the parties, Williamson-Brooks Company and The Seaboard Oil Company have all of the rights and liabilities under the lease Exhibit A as lessor and lessee respectively.

Pertinent parts of the lease are that the term was for five years from October 15th, 1927; the rent was $600. per year, payable in advance in monthly payments of $50. each,

"And it is further agreed, that if the said rent shall remain unpaid twenty days after the same shall become payable as aforesaid, . . . then this lease may, at the option of the Lessor, thereupon terminate, and said Lessor may at any time thereafter re-enter into said premises and the same have and re-possess as of its former estate;"

"It is further agreed that the Lessees shall, within a reasonable time after the commencement of this lease, erect on the aforementioned premises a permanent building or buildings, which shall not be removed without the consent of the Lessor; and shall install such tanks or other equipment as will place the premises in condition for operation as a Gasoline Filling Station, and shall cause said premises to be graded and to be landscaped and ornamented by the

placing of small trees and shrubs; and that said tanks and other equipment so placed on said premises is and shall remain the property of the Lessees and shall be removed by the Lessees prior to the expiration of this lease, either by expiration of time limit or cancellation for cause; and that any excavation caused by such removal shall be properly backfilled, leaving the surface of the ground level, free from rubbish and in good order; and any damage to any building or pavement shall be properly repaired by the Lessees immediately upon such termination;"

"The Lessor hereby grants to the Lessee, their executors, administrators and assigns, the option to purchase the premises herein leased at any time during the five year continuance of this lease at a purchase price of SEVEN THOUSAND ($7,000.00) DOLLARS: and in the event such option is not exercised within said period the Lessor further grants the option of renewal of this lease for an additional term of five years at a rental of SIXTY ($60.00) DOLLARS per month and the further option during the continuance of said renewal period to purchase the premises herein leased at a purchase price of EIGHT THOUSAND ($8,000.00) DOLLARS."

"In the event of the exercise of either purchase option the Lessor agrees to convey said premises by a good and suffcient warranty deed, free and clear of all encumbrances, within thirty days after the Lessees have given to the Lessor written notice of their intention to exercise such option; and the Lessees agree that said purchase price shall be payable in cash on tender or delivery of said deed."

"No holding over by the Lessees shall operate to renew this lease without the prior written consent of the Lessor. No waiver by the Lessor of any default by the Lessee shall affect its right to enforce the provisions of this lease in the event of any subsequent default."

At this point it is to be noted that the exercise by the lessee of either of the options to purchase is to be in writing, while the lease is silent as to the method to be used by the lessee in exercising its option of renewal or extension of the lease.

The land was low, swampy and unimproved. The lessee took possession and spent $14,000. in draining, filling and grading the land, in constructing a building and in erecting and installing a gasoline service station with tanks, pumps and pits,

together with necessary facilities for furnishing electric light, water and sewerage. The plaintiff established upon the site what has developed into a successful business of selling gasoline, motor oils, fuel oils, range oils, factory oils and tires. During the years 1930 to 1934, the average sale of gasoline per year was 208,393 gallons. During the whole period down to the present, the business of the plaintiff has been financially profitable and, located as it is on a main highway, the good will of the business is, at the present time, very valuable. The land, building and accessories, exclusive of good will and stock of merchandise on hand, are at the present time worth at least $20,000.

On January 10th, 1930, the defendant leased by written lease unto the plaintiff certain other land in Fairfield for a term of five years for a substantial rental, payable in monthly payments in advance on the first day of each month. This lease is designated and reference will be made thereto as **Exhibit W.**

On March 6th, 1931, an agreement was made for the rental of certain other land in Fairfield by the defendant to Lou's H. Serre for a term of ten years for a substantial rental, payable in monthly payments in advance on the first day of each month. This agreement of lease is designated and reference will be made thereto as **Exhibit Y.**

Louis H. Serre was, and is, the principal stockholder in the plaintiff corporation and his is the controlling voice therein.

It became and was the custom of the defendant to send to the office of the plaintiff invoices for the rent due from the plaintiff on **Exhibit A** and **Exhibit W** and from Louis H. Serre on **Exhibit Y.** It became the custom of the plaintiff to send its one corporate check in payment of the monthly rent due on **Exhibits A, W and Y.**

Notwithstanding the fact that the rent was due in advance on these leases, it grew to be the custom of the plaintiff to remit the check for the rent on the three leases **A, W** and **Y** some days later than the 20th day after the day when the same was due, so that, according to the terms of the lease **Exhibit A,** the plaintiff, for a long time, was each month in default of such rent. These payments were always accepted by the defendant until November, 1934.

On April 13th, 1932, the defendant sent to the plaintiff the following letter **(Exhibit N):**

"THE WILLIAMSON-BROOKS COMPANY
Fairfield, Conn.

April 13th, 1932.

The Seaboard Oil Co.,
Fairfield, Conn.

Gentlemen:—

This will confirm arrangement of today between the writer and your Mr. Louis H. Serre, whereby we are agreeable to a moratorium on the rent payable under the terms of lease dated October 8, 1927 covering Lots 19 and 20, corner of Post Road Cut-off and Belmont Street, for all or any part of the period, at your option, beginning May 1st, 1932 and ending May 1st, 1933.

We will render invoices for this rent in the usual manner and each such invoice rendered during the period of this moratorium will bear the notation "Payment of the above rental may be deferred as provided in our letter of April 13, 1932".

At the end of the moratorium, mutually satisfactory arrangements will be made to cover the payment of the back rent.

Very truly yours,

J. K. WILLIAMSON, Sec'y."

In accordance with this letter, no rent was paid from May 1st, 1932 until within the month preceding May 1st, 1933, at which latter time the rent for this period was paid in full.

There appears in evidence letters from the defendant to the plaintiff sent between May 1st, 1932 and May 1st, 1933 showing the statement of the account as to the three leases and requesting payment on **Exhibits W & Y**, but there is no letter in evidence complaining of delay in payment of the rent on **Exhibit A.** The defendant offers evidence that oral demands were made from time to time for payment of rent on **Exhibit A.** These demands, if they were made, were for the payments of amounts due, requests that a creditor would make of a debtor in the ordinary course of business. There is no evidence that any claim was ever made by the defendant upon the plaintiff for payment on **Exhibit A** because the failure to pay was contrary to the terms of the lease.

The plaintiff claims that before the expiration of the term of the lease it notified the defendant, by letter, that it desired to continue the lease for a further term of five years. The defendant denies receiving such a letter. The plaintiff is unable to produce a copy of such letter but there is an explanation of its inability to produce such copy. The plaintiff offers evidence that Louis H. Serre verbally notified John K. Williamson, an officer of the defendant company, of the desire

of the plaintiff to continue the lease. John K. Williamson denies this. Upon this state of evidence on this point, we must look to other evidence for a determination of the fact.

The plaintiff did, in fact, occupy the premises and pay the contracted rent therefor until November, 1934, without hindrance or objection from the defendant, and the defendant accepted such rent. The initial term of **Exhibit A** expired on October 15th, 1932. The moratorium granted the plaintiff by the defendant in **Exhibit N, supra,** includes the period from October 15th,.1932 to May 1st, 1933. On October 1st, 1932, the defendant, writing to the plaintiff, said in part:

"By way of reminder, the Belmont Street rental increases from $50. to $60. per month on October 15th, and the purchase price from $7000. to $8000. **(Exhibit O.)**"

On November 15th, 1932 and December 15th, 1932, invoices of the defendant to the plaintiff on **Exhibit A** are, in part, as follows:

"To rental of lots #19 and #20 Belmont Street . . . **as per lease** $60.00. Payment of the above rental may be deferred as provided in our letter of April 13, 1932."

So invoices during the years 1933 and 1934 contain the words "**as per lease**". These different pieces of evidence constitute a plain unmistakable recognition by the defendant that the lease **Exhibit A** existed as a lease during this long period following October 15th, 1932.

To be sure, the lease contains the clause:

"No holding over by the lessees shall operate to renew this lease without the prior written consent of the lessor. No waiver by the Lessor of any default by the Lessees shall affect its right to enforce the provisions of this lease in the event of any subsequential default."

But here was no mere "holding over"; here was a possession under the lease and a recognition and consent of the defendant that such possession was by virtue of the lease.

On November 8th, 1934 the defendant served upon the plaintiff a notice to quit. On November 22, 1934 the defendant caused to be served upon the plaintiff a writ of summary process based upon a claimed breach by the plaintiff of **Exhibit A** by the plaintiff's failure to pay rent due October 15th until more than twenty days thereafter. Immediately following the service of the notice to quit, the plaintiff tendered unto the defendant a check for $60. and offered to pay any other amounts due, which tender and offer were refused by the defendant.

On November 15th, 1934 the plaintiff sent by mail unto the defendant the following letter, **Exhibit D-1.**

"Bridgeport, Conn.
15 November, 1934.

Registered Mail
Return Receipt Requested.
Williamson-Brooks Company
and Harry H. Williamson,
Fairfield, Connecticut.
Gentlemen:

Pursuant to the provisions of the lease between Harry H. Williamson, Lessor, Daniel I. McNamara and Louis H. Serre, Lessees, which lease has been duly assigned to the Seaboard Oil Company, this is to advise you that the said Seaboard Oil Company hereby exercises its option to purchase the property covered by said lease, bounded and described as follows:

North: On the southerly boundary of the Post Road Cut-off, 142 feet, more or less;

East: On land now or formerly of Levy Turney, 65 feet, more or less:

South: On land now or formerly of Andrew Johnson, 118 feet, more or less;

West: On Belmont Street, a proposed street, 101 feet, more or less.

Kindly advise the writer on what date you intend to tender a deed to said premises. At the time of said tender or delivery of said deed in accordance with the provisions of said option, the said Seaboard Oil Company will pay to you the sum of eight thousand ($8.000.00) dollars in cash.

Thanking you in advance for the courtesy of an early response, we beg to remain,

Very truly yours,
LAVERY & FINKELSTONE,
By: L. S. Finkelstone."

On November 26th, 1934, a Judge of this Court issued a temporary injunction enjoining the defendant from prosecuting the suit in summary process. The cause, having been heard by this Court upon issues closed, is now to be determined.

That there was a valid legal assignment of the interest of Harry H. Williamson in the lease **Exhibit A** and the land described therein to The Williamson-Brooks Company, and a

valid legal assignment of the interest of Daniel I. McNamara and Louis H. Serre in such lease and land is hardly disputed and are found to be facts.

The lease provides that "the Lessor further grants the option of renewal of this lease for an additional term of five years at a rental of SIXTY ($60.00) DOLLARS per month";

"No holding over by the Lessees shall operate to renew this lease without a prior written consent of the Lessor."

Notwithstanding the fact that the word "renewal is used, the option was for either an actual new lease or for an extension of the original lease, whichever was intended by the parties. We must look to the evidence for such intention. No mere holding over by the lessee would operate to renew the lease without the prior written consent of the lessor. In addition to the holding over by the lessee, there must have been some further act or acts on the part of the lessee indicating an intent on their part to continue the lease; there must have been some act or acts on the part of the lessor indicating an intent on their part that the lease should be continued. No written notice from the lessee to the lessor of the desire, on the part of the former, to continue the lease is required by the terms of the instrument. The lessee has continuously up to the present time conducted an active business on the leased premises. The office of the lessor is not far from and in plain sight of the leased premises and its officers knew constantly that the lessee was occupying the premises and conducting an active business. Each month from the commencement of the lease to May 1st, 1932, and from May 1st, 1933 to November, 1934, the lessee has paid rent on the lease. The rent for the period from May 1st, 1932 to May 1st, 1933 was paid in April, 1933, with the consent of the lessor in writing. All of this rent has been accepted by the lessor. The written moratorium granted by the lessor—May 1st, 1932 to May 1st, 1933—covered in part a period beyond the designated limitation of the lease October 15th, 1932. In numerous invoices rendered by the lessor to the lessee after October 15th, 1932, the monthly rental of $60.00—not $50.00 was set forth.

"There can be no question that the option given the lessee in the lease for a further period was one for an extension and not a renewal. Whether a provision operates as one or the other is a matter of intention, and the use of the word 'renewal' is by no means conclusive."

Carrano vs. Shoor, 118 Conn. 86, 93.

"A technical distinction has been recognized between a covenant for renewal and one for extension. It has been held that under the former a new lease or at least some affirmative act creating an additional term is required. The question as to which exists may be controlled by the intention of the parties as manifested by the entire lease, or by their practical construction of their contract, whereby the privilege may be construed as one for an extension of the term although it is called one for a renewal."

Johnson vs. Mary Oliver Candy Shops, Inc., 116 Conn. 86, 89.

"A technical difference is frequently recognized, however, between the effect of a covenant for renewal and one for extension, especially as to the effect of retention of possession after the original term, it being held that a stipulation for renewal does not, like a covenant to extend, of itself and alone continue the tenancy for the renewal period, but calls for a new lease, a formal extension of the existing lease or something equivalent thereto, performance by the lessee of everything required of him to entitle him to a new lease, or, at least, some affirmative act by way of creation of an additional term. . . . . But it is recognized that the technical difference may be controlled by the intention of the parties as manifested by the entire lease or by their practical construction of their contract, as by conduct before the controversy arose, whereby the privilege may be construed as one for an extension of term, though the language employed in a strict technical sense, may signify renewal. The mere fact that the privilege is called one to renew is not conclusive."

Ackerman vs. Loforese, 111 Conn. 700, 704.

"Whether a clause in a lease is a covenant of renewal or an agreement for an extension depends upon the intention of the parties as to the lease, and the use of the word "renewal", although it imports the giving of a new lease like the old one does not necessarily indicate that it is used in this strict and technical sense; the entire lease may determine otherwise."

Freiheit vs. Broch, 98 Conn. 166, 169.

I find that it was the intention of the parties that the lease might be extended and that this option for extension of the lease was exercised by the lessee, recognized by the lessor,

and the lease was so construed by both parties.'

The lease provides that the rent shall be paid on the 15th of each month, in advance, and that if it remains unpaid twenty days after being payable, the lease may, at the option of the lessor, thereupon terminate. The notice to quit is dated November 8th, 1934. The rent due October 15th, 1934 was more than twenty days overdue. On many occasions prior to November 8th, 1934, the rent had not been paid until a few days more than twenty days after the rent was due; but it had always been paid within the month—barring the period of the moratorium—and had always been accepted by the lessor. We must bear in mind that there were two other leases—W & Y— the rent for which was paid in one check, together with the rent on Exhibit A.

There is no letter in evidence wherein the lessor complains of the delay in the payment of rent on Exhibit A. The lessor may have made oral requests for the payment of such rent but there is no evidence that the lessor complained to the lessee that the latter was violating the terms of the lease. Paying the rent as it did during the years 1933 and 1934, the lessee was lulled into a feeling of security by the acceptance of such payment, without objection, by the defendant. If the lessor, having for a long time accepted rent paid thus tardily, sud-denly decided to insist upon the letter of the lease as to pay-ment, it should, in fairness, have notified the lessee of such intention. Moreover, the lessee had expended a considerable sum of money in establishing a profitable business on the leased premises, and a cancellation of the lease would work a destruction of this business and permit the retaking by the lessor of the premises greatly enhanced in value at the expense of the lessee.

> "We think the better rule to be that in cases of wilful or gross negligence in failing to fulfill a condition prece-dent of a lease, equity will never relieve. But in case of mere neglect in fulfilling a condition precedent of a lease, which does not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease."

Fountain Co. vs. Stein, 97 Conn. 619, 627; Thompson vs. Coe, 96 Conn. 644; Zanthakey vs. Hayes, 107 Conn. 459; Finlay vs. Swirsky, 103 Conn. 624; The Sleeping Giant Park Association, Inc. vs. Conn. Quarries Co., Inc.,

**115 Conn. 70.**

A mere statement of the effect of the judgment of the Court upon the plaintiff and the defendant discloses the conclusion which must be reached in this matter by a court of equity.

If the judgment is in favor of the defendant, the plaintiff will, after having spent $14,000., in improving this site and establishing a successful and valuable business upon it, lose not only possession of the land, but lose this business, while the defendant will retake the land and also all of the valuable improvements made to the land by the plaintiff. If the judgment is in favor of the plaintiff, the plaintiff and the defendant will each receive just what was agreed in the lease Exhibit A, except that the defendant has lost the use of $50.00 or $60.00 for a few days each month, for which loss the defendant is partly at fault for not having sooner enforced the terms of the lease.

Why the defendant took the action that it did in serving the notice to quit is of no consequence in this case. There is evidence of negotiations between the parties concerning the sale and purchase of this land and other land; there is evidence that one of the other two leases was relinquished by the lessee upon its termination. Perhaps the lessor hoped, by the notice to quit, to enforce its will upon the lessee. Be this as it may, I find that it would be inequitable to declare the lease forfeited. Such a result would, upon the facts of the case, give the lessor an unconscionable advantage and gain over the lessee.

As heretofore set forth, the lessee has, by the terms of the lease, the option to purchase from the lessor the real estate described in the lease for $8000. upon giving written notice of its desire to exercise such option of purchase.

A court of equity, having acquired jurisdiction of a matter, must do full equity. The plaintiff alleges in its complaint that it has given to the defendant written notice of its desire to exercise such option of purchase, and, in its prayer for relief, prays that it be decreed that the defendant execute and deliver unto the plaintiff a deed of the property described in the lease.

I find that such a written notice of intention by the lessee to purchase the property from the lessor was given to the lessor by the lessee.

IT IS ADJUDGED AND DECREED, That the temporary injunction in this case is made permanent.

That at ten o'clock in the forenoon on the 14th day of March, 1935, the defendant deliver to the plaintiff, at the

office of the plaintiff on the premises described in the lease, a good and sufficient warranty deed, free and clear of all encumbrances, except said lease, and that the plaintiff shall, at such time and place, pay unto the defendant by cash or certified check the sum of EIGHT THOUSAND ($8,000.) DOLLARS, and, in addition thereto, such proportionate part of the taxes due to the town of Fairfield, or that shall have been paid to the Town of Fairfield by the defendant, as the number of days from September 1st, 1934 to March 14th, 1935 shall bear to the 365 days of the year,

And, further, that the plaintiff shall pay unto the defendant rental of $60. per month under the terms of the lease **Exhibit A** from October 15th, 1934, with interest at the rate of six per cent per annum, on each sum of $60., from the date upon which it was due, to wit, on the 15th day of each month, in advance, to the date of payment.

If execution of this decree be stayed by appeal, the date of delivery of the deed of the premises by the defendant and payments to be made by the plaintiff shall be at said place at ten o'clock in the forenoon on the Tuesday after the second Monday after such stay of execution shall be vacated by law or rule of court, and the amount to be paid as taxes and rent and interest upon rent shall be adjusted in the manner and form hereinbefore set forth.