[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Ronald M. Hedberg, claims that the defendant, Pantepec International, Inc. ("Pantepec"), breached his employment contract and violated the Connecticut Unfair Trade Practices Act ("CUTPA") when it terminated his employment at the end of June 1989.
The defendant claims that the employment contract was voidable CT Page 2160 because it was entered into in the context of a proxy battle as an illegitimate means of continuing the favored policies of the board of directors that was displaced in the proxy vote.
As filed, the plaintiff's complaint contained, as its second count, a statutory claim for unpaid wages. This count was stricken by the court, O'Keefe, J., on June 6, 1990, along with a corresponding claim for statutory remedies.
The defendant filed special defenses directed at both Count One (the contract claim) and Count Three, the CUTPA claim. The court, McKeever, J., granted the plaintiff's motion to strike several of the defendant's special defenses: the first, which alleged that the employment contract was ultra vires; the fifth, which was directed at the stricken second count; and the seventh, which alleged that the CUTPA count failed to state a cause of action as to which relief could be granted. These adjudications left the following special defenses: the second, which alleges the employment contract was void as the product of self-dealing; the third, which alleges that the contract was an unlawful attempt to ensure entrenchment of incumbent management; and the fourth, which alleges that the employment contract is unenforceable because it is intrinsically unfair and was not ratified by the corporation's stockholders. The sixth special defense was directed at the stricken second count of the complaint.
FACTS
The court finds the facts to be as follows. The plaintiff who holds a doctorate in petroleum geology, worked for several years for the defendant corporation as a consultant before being hired in February 1987, shortly after the death of the company's founder, to serve as president and as a director of the corporation. Though Pantepec, a Delaware corporation, is publicly traded on the Boston stock exchange, it never had more than two employees from 1987 on. From its inception, it has been an investment company engaged in exploring and investing in oil and gas properties, work performed on a part-time basis by the plaintiff, who reported to the company's directors.
Shortly after he became president of the corporation, the plaintiff and the corporation entered into an agreement, summarized in a letter (Ex. D) setting forth the terms of the plaintiff's employment. This brief agreement did not provide for any fixed term of employment, nor did it restrict termination to CT Page 2161 good cause or provide for any safeguards for the plaintiff's benefit in the event of a change of directors.
At a meeting of the board of directors on November 6, 1985, the board, with the plaintiff abstaining, voted to increase the plaintiff's compensation from $30,000 per year for one-third time to $60,000 per year for two-thirds of his time (Ex. E), with the same provision for business expenses, medical and dental insurance, and a SEP-IRA contribution in the amount of fifteen percent of his salary as had been specified in the letter agreement of March 25, 1985.
In 1987, the defendant hired as its second employee Rudolph Bremser, an accountant who was named corporate treasurer and vice-president. The evidence does not indicate that Bremser was a party to a written employment contract from 1987 until May 1989, when he was furnished a written contract at the same time as the plaintiff.
Between 1987 and 1989, Pantepec, through the plaintiff, was engaged in trying to locate merger partners. Pantepec came to the attention of Robert A. Levinson, a New York investor whose primary expertise was in the textile industry. In February 1989, Levinson advised Pantepec's three directors, Hedberg, Harold D. Hansen, and Frederick A. Hemming, that his analysis was that they were not conducting the company properly by continuing to limit its activities to oil and gas investments, and that they should turn over control to him for the benefit of the corporation's approximately 7,000 shareholders. When the directors refused, Levinson announced that the shareholders would decide, and he put up a slate of directors of his own choosing and solicited proxy votes from shareholders.
Levinson gave the directors the impression that he thought Pantepec should cease its endeavors in the fields of oil and gas and pursue other ventures that he thought would create more profit. He stated no particular plans, and the directors were apprehensive that, if he took over the company, he would not have sufficient expertise to get fair value for the company's oil and gas investments.
Immediately after this February 1989 ultimatum, the plaintiff and Mr. Bremsen visited Pantepec's lawyer, Alan Spier at Robinson and Cole, and related Levinson's statements. Spier inquired whether the plaintiff and Bremser had written employment CT Page 2162 agreements.
On May 22, 1989, while proxies were being received, directors Hedberg, Hemming and Hansen held a meeting by telephone conference call to discuss, among other things, the draft employment agreements for Hedberg and Bremser that had been mailed to the directors prior to this meeting. Bremser's contract was approved by all three directors; Hedberg's was approved by the other two directors, as he abstained. The corporate minutes, recorded by Bremser, reflect no discussion or changes to the circulated version of either contract. Hedberg's contract was not submitted to shareholders for ratification.
At the same meeting, the directors voted to raise from one-quarter to one-third the number of shares of issued stock that must be represented to constitute a quorum of shareholders under the corporation's bylaws. The directors also approved expenditures incurred in contesting what the minutes describe as "Robert A. Levinson's solicitation in opposition to management." (Ex. F).
The plaintiff signed the employment agreement the next day, May 23, 1989. The agreement, which had been drafted by Attorney Spier, comprised eight and one-half pages and provided, among other things, for the following:
 1. no change in salary or time required to be devoted to company business during a two year period of employment as president of the company;
 2. limitation of termination to "good cause", defined as a) gross or repeated misconduct, b) conviction of a crime, c) theft, embezzlement or comparable breach of trust or dishonesty against the company, d) breach of a material provision of the contract;
 3. employee's right to terminate his services under certain conditions, including an opportunity to do so if the company underwent a "change in control";
 4. severance pay and continuation of benefits for twelve months or the number of months remaining under the term of the contract, whichever was greater; CT Page 2163
5. indemnification for acts and omissions;
 6. pledge by the company to require any successor to assure performance of the agreement.
The employment agreement signed by Bremser contained the same features.
The annual meeting of Pantepec was held on May 24, 1989. The votes for the incumbent slate and the Levinson slate of directors were so close that the meeting was continued for a recount. On June 15, 1989, at the reconvened annual meeting, it was announced that the Levinson board had won. Later the same day, Levinson asked the plaintiff to sign an agreement abrogating his employment agreement. Levinson made statements to the effect that unless the plaintiff agreed to do so, he would not be employed in any capacity. Levinson testified that he believed the employment agreement was invalid and that its terms constituted a breach of the former directors' fiduciary duties to the corporation; and he so advised the plaintiff by a letter dated June 16, 1989 (Ex. L).
The plaintiff reused to sign. He performed some services for Pantepec until the end of June 1989. By a letter dated June 29, 1989, Levinson notified the plaintiff that his employment was terminated. (Ex. M). Pantepec did not pay the plaintiff severance pay nor any of the other benefits set forth in the employment agreement of May 23, 1989.
The court finds that the employment agreement at issue was unmistakably a defensive mechanism, entered into in reaction to the proxy contest. At the time they authorized the employment agreements with Hedberg and Bremser, the directors were in charge of a company that had only approximately $1 million in assets, mostly in the form of stock in an oil company and interests in properties producing or hoping to produce oil and gas. Pantepec's only office was in Connecticut where Hedberg lived. Director Hansen lived in Florida and director Hemming lived in Calgary, Canada. For several years, all of the actual ongoing operations of the company had been performed by a single person, Hedberg, with accounting backup from Bremser. As of 1989, Hedberg knew the company's existing assets and had been conducting its activities for several years. Harold Hansen, one of the two directors who approved Hedberg's employment contract on the eve of the outcome of the proxy contest, testified that CT Page 2164 the purpose of the employment agreement was to protect shareholders by assuring that there would be a knowledgeable person in charge, in case of a change of directors, to look after an orderly transition in which oil and gas assets might be disposed of. Hansen testified that he was under the impression that Levinson was not sufficiently knowledgeable about oil and gas interests, and since Hedberg was the only source of continuity, his services should be secured by a written agreement.
Levinson had made it clear to the directors in February 1989 that he wished to turn the company to other ventures. Both the timing and context of the creation of the employment agreement lead the court to the conclusion that it was devised in direct response to the proxy fight.
APPLICABLE LAW
The parties agree that their claims concerning the enforceability of the Hedberg employment contract are governed by Delaware law, as Delaware is Pantepec's state of incorporation. They further agree that under Delaware law, corporate directors, who owe the corporation a fiduciary duty, are presumed to act in good faith under the "business judgment rule," by which courts refuse to substitute their judgment for the judgment of directors as to business decisions made in good faith. See, e.g., Polk v. Good, 507 A.2d 531, 536 (Del. 1986). Though the business judgment rule has been held to be applicable in the context of a takeover, Pogostin v. Rice, 480 A.2d 619 (Del. 1984), in that context the presumption of valid exercise of business judgment is subject to inquiry when the business judgment at issue is the board's adoption of a defensive mechanism. In such a situation, which this court finds to be present in the facts presented, it must be established by the party seeking to uphold the validity of the directors' actions that 1) they had reasonable grounds to believe that the defensive mechanism was justified by a danger to corporate policy and effectiveness, and 2) that the defense mechanism adopted was reasonable in relation to the threat posed. Unocal Corp. v. Mesa Petroleum, 493 A.2d 946, 955 (Del. 1985); Stahl v. Apple Bancorp, Inc., 579 A.2d 1115, 1124 (Del.Ch. 1990); Moran v. Household International, Inc., 500 A.2d 1346,1355-57 (Del. sur. 1985); A C Acquisitions v. Anderson, Clayton Co., 519 A.2d 103, 111 (Del.Ch. 1986). While directors have a fiduciary duty to protect the corporation and owners from perceived harm, the defensive measures they take in the face of a CT Page 2165 potential change in control must be shown to be motivated by a good faith concern or the welfare of the corporation and its stockholders and must be reasonable in relation to the threat posed. Unocal, supra, at 955.
Pantepec's directors clearly perceived the Levinson proxy challenge as a danger. Pantepec had been exclusively engaged in oil and gas investments, and it was a tiny company with only one employee with any ongoing knowledge of its substantive business. If he were summarily fired, there was reason to believe that the corporation would suffer. Levinson had not outlined his plans for the company beyond indicating that it should get out of oil and gas investments, a project that suggested that disposition of related assets would be the first order of business.
The fact that a board enters into obligations with employees that may affect the options of subsequent boards and and act as a defensive mechanism, does not, alone, make the obligations unfair. Shamrock Holdings, Inc. v. Polaroid Corp., 559 A.2d 257,276 (Del.Ch. 1989). Even if a compensation plan is initiated as a defensive mechanism, it is valid if it benefits the company and is fair. id.
The defendant stresses two features of the Hedberg employment agreement which are either unfair and therefore violative of the directors' fiduciary duties, or unreasonable in relation to the threat posed by a change in directors pursuant to the Unocal standard of review set forth above. The first is that the employment contract obligated the corporation to employ Hedberg as president for two years when the corporate by-laws provide for one-year presidential terms. The second is that the agreement, at Section 6, gave Hedberg the right to severance pay for up to twenty-three months if he terminated his services for "good reason", defined to include, under most circumstances, a change in the incumbent board of directors.
Accordingly, by the terms of the employment agreement, if the pending proxy contest resulted in the election of Levinson's board, Hedberg was not obligated to provide services other than for a one-month period after giving notice, and the corporation was obligated to pay severance pay of up to twenty-three months. Since the terms of the agreement entitled Hedberg to the same compensation and benefits for twenty-three months whether or not he chose to continue to work for Pantepec, the agreement was not reasonably calculated to achieve the continuity that director CT Page 2166 Hansen testified was the reason for its creation. Instead, the agreement protected Hedberg, an officer and director, at the expense of the corporation without even attempting to secure the stated advantage of continuity and expertise for the company.
Accordingly, the court finds that the Hedberg employment agreement is not entitled to the deference of the "business judgment" rule and that it fails to meet the standard applicable pursuant to Unocal.
The court further finds that the new directors of Pantepec properly concluded that the employment agreement was invalid and voidable, and the plaintiff cannot prevail on his claim for its enforcement.
CUTPA CLAIM
The plaintiff's claim that the defendant violated CUTPA by refusing to honor his employment agreement must fail. It is unnecessary for this court to decide, as many courts have done, whether CUTPA extends to the employer-employee relationship. See, e.g. Porter v. Hartford Anesthesiology Associates, Inc.4 Conn. L. Rptr. 283 (Wagner, J., 1991); Quimby v. Kimberly Clark Corp., 4 Conn. L. Rptr. 167 (Susco, J., 1991); Krupa v. United Technologies, 2 CSCR 740 (Maloney, J., 1987); DiNicola v. Stop and Shop Companies, 4 Conn. L. Rptr. 8 (Flanagan, J., 1991); Fitzgerald v. Forelli, 2 Conn. L. Rptr. 388 (Thim, J., 1990), (all holding that CUTPA does not regulate employment where employment is not, itself, the defendant's trade or business), but see Lewis Personnel, Inc. v. Peter Spence Corp., 1 CSCR 48 (Lewis, J., 1986).
Since the employment agreement relied on has been found to have been violative of the Hansen board's fiduciary duties to the corporation, and therefore voidable, refusal to be bound by it cannot give rise to a finding of an unfair trade or business practice by the new board of directors.
CONCLUSION
Judgment shall enter in favor of the defendant as to both remaining counts of the complaint. The defendant shall recover its statutory court costs.
Beverly J. Hodson, Judge CT Page 2167