## THE SLEEPING GIANT PARK ASSOCIATION, INCORPORATED, *vs.* THE CONNECTICUT QUARRIES COMPANY, INCORPORATED.

Maltbie, C. J., Haines, Hinman, Banks and Avery, Js.

Argued April 15th—decided May 10th, 1932.

*George E. Hall* and *Philip Pond,* for the appellant (defendant).

*Frederick H. Wiggin* and *Arnon D. Thomas,* for the appellee (plaintiff).

AVERY, J. In 1884, Willis M. Cook acquired a tract of land of about sixty-six acres east of Whitney Avenue and bounded by it on the west in the town of Hamden. July 27th, 1911, Cook executed an agreement with Connecticut Trap Rock Quarries, Inc., whereby the Quarry Company was given the right, for a period of twenty years with the privilege of renewal for an additional term of twenty years upon the same terms, to quarry stone and rock on the leased premises, subject to restrictions in the agreement. The premises leased by this agreement were a large part of the property acquired by Cook in 1884. Included in the land leased is part of Mount Carmel, a mountainous ridge, running in a general easterly and westerly direction which, by reason of its contour as one views it from the south, is called "Sleeping Giant Mountain" or "The Sleeping Giant." The head of. "The Sleeping Giant," the contour of which was originally a convex line, is toward the west and rises abruptly from the lowland, a mass of solid rock with a covering of earth on which grow bushes and trees. Included, also, in the leased land is a small hill, or outcropping, of rock, called the "Dumpling."

The restriction in the agreement was in the follow-

ing words: ". . . except that the party of the second part agrees not to take any rock out of the knoll known as the 'dumpling' nor to take any rock at any point where the quarry face will show from Mount Carmel Avenue."

June 6th, 1921, Cook conveyed the entire property, including the leased premises, to his wife, Nellie M. Cook; June 10th, 1930, she conveyed the property to the plaintiff together with her interest in the agreement and her right to enforce the covenants thereof. April 28th, 1913, The Connecticut Trap Rock Quarries, Inc., assigned all its interest in the agreement to The Connecticut Quarries Company, which, January 20th, 1925, assigned the same to the defendant. Immediately after the execution of the agreement, The Connecticut Trap Rock Quarries, Incorporated, took possession of the land, and, with reasonable promptness, installed a plant, constructed crusher and building foundations, erected stone crushing machinery and boiler house thereon, laid out roads, railroad sidings and tracks, and developed a quarry face and a quarry floor, and either by itself or its successors continued to operate the plant and quarry stone thereat up to the time of the institution of this action.

Cook lived with his wife on the land, from 1884 until his death in 1921, in a house facing Whitney Avenue, and Mrs. Cook continued to live there until June 1st, 1930. Whitney Avenue runs substantially north and south; Mount Carmel Avenue runs substantially east and west on the south of the quarry land; and Tuttle Avenue east and west on the north. The intervening land between the quarry and Mount Carmel Avenue is thickly wooded. Whitney Avenue and Tuttle Avenue are the only highways adjacent to the leased premises, or land owned by Cook in that

vicinity. The approach to the quarry is from Tuttle Avenue on the north by a private roadway extending therefrom to the quarry floor. The area included in the leased premises includes practically the entire head of the "Sleeping Giant" and the easterly boundary passed under the chin of the Giant. The quarry floor is located approximately seventy-five feet above the grade of Whitney Avenue, so that gravity might be utilized in handling rock; but the primary reason for such location was that as limestone or sandstone underlie trap rock, it was necessary to place the quarry floor high enough so that neither would be encountered in the quarrying operations. The line of vision from Mount Carmel Avenue crosses the southern edge of the quarry at an elevation, from the quarry floor or base of the quarry, of approximately eighty-five feet, and crosses the northern edge at an elevation of approximately one hundred and eighty-five feet. The distance between these two points is five hundred feet. The distance across the quarry floor between the north and south walls is approximately four hundred and seventy-five feet. The distance from the mouth of the quarry to the bottom of the quarry face, measured east to west, is approximately one hundred and sixty feet. The elevation from the floor of the quarry to the top of the cut or highest point is approximately three hundred and twenty-five feet. The elevation from the floor of the quarry to the average height of the line of vision is approximately one hundred and thirty-five feet. The elevation from the average height of the line of vision to the top of the cut is approximately one hundred and ninety feet. A plateau, the width of the quarry and on the same level as the floor, extends one hundred and forty feet west from the mouth. At the edge of this plateau, with their foundations on the lower levels, are the crusher and other machinery used

in connection with the operations. The elevation from the quarry floor to the highest point of the "Dumpling" is approximately one hundred and thirty-five feet. The area of the quarry floor is approximately sixty thousand square feet. The "Dumpling" is situated between the quarry and Mount Carmel Avenue, and the contour and location of the "Dumpling" on the leased premises, as viewed from Mount Carmel Avenue, is such that it has always been possible to quarry stone on the leased premises in such a manner that the rock uncovered by such operation could not be seen from Mount Carmel Avenue. The Quarry Company began its operations at such an elevation as to be unseen from Mount Carmel Avenue, but gradually worked higher. For a period of years, impossible to definitely determine, there has been visible from that part of Mount Carmel Avenue adjacent to Whitney Avenue a triangular area of bare rock uncovered by the quarry operations, amounting to about nine thousand square yards, and forming the upper part of the quarry face. At a point on Mount Carmel Avenue, about one hundred and thirty-five feet west of the Mill River Bridge, more of the upper portion of the quarry face can be seen than from any other point on that avenue. At the north, or left, edge of the quarry face, the lowest point thereon within the line of vision from Mount Carmel Avenue is about one hundred and eighty-five feet above the quarry floor, and on the southern, or right, edge of the quarry, the lowest part of the quarry face that can be seen in the line of vision from Mount Carmel Avenue is about eighty-five feet above the quarry floor. The actual quarrying of trap rock was first begun in 1912, and such operations have continued to the time of the institution of this action. Before actual operations were commenced, the quarry face had to be opened at an

expenditure of much time and money. This was an expensive operation, consisting of cutting down trees, removing earth, brush and débris.

Remittances of royalties due to Mr. Cook and later to Mrs. Cook were sent monthly and accepted by them without objection as to the amount thereof or from what part of the quarry the rock was removed. Monthly "credit memoranda" were mailed to and received by Mr. Cook and, after his death, by Mrs. Cook, stating the amount of trap rock shipped from the quarry during the period indicated, and accompanied by a check for the royalties due thereon. During the entire period, the Quarry Company paid to the Cooks two cents per cubic yard of rock carried away from the premises, in accordance with the terms of the agreement, which was accepted by them up to the date of the sale of the property to the plaintiff. From the time of the execution of the agreement until his death in 1921, Mr. Cook constantly observed all of the operations of the company, including the installation of the plant, the opening of the quarry face and its continuous enlargement and development, and made no objection or protest against any operations, except that he pointed out a south line beyond which such quarrying operations should not be carried, and such operations have not been continued south of a line substantially twenty-five feet north of the line indicated by Mr. Cook. On numerous occasions, he urged the companies to increase the output so that his royalties would be increased and he would receive a larger income from the property. At that time, the upper part of the quarry face was visible from Mount Carmel Avenue. Mrs. Cook continuously observed the operations of the company from July 27th, 1911, to June 10th, 1930, and made no objection nor protest as to any of such operations, and neither Mr. or Mrs.

Cook ever made demand or presented any claim for damages by reason of the quarry operation of the defendant or its predecessors. Mr. Cook's residence was on the east side of Whitney Avenue about three thousand feet south of Tuttle Avenue and about one thousand feet from the quarry face. During this period, the defendant and its predecessors quarried and sold upwards of one million cubic yards of crushed stone.

The entire property was purchased by the plaintiff from Mrs. Cook June 10th, 1930, with full knowledge of its condition and the extent to which the defendant and its predecessors had operated the quarry, and that a portion of the quarry face could be seen from Mount Carmel Avenue. The plaintiff had full knowledge of the agreement between Cook and the Quarry Company, and had knowledge that a condition of the agreement was being violated. The plaintiff solicited subscriptions from people for the purpose of purchasing the property and represented that one of the objects in purchasing was to enforce the agreement. It was the intention of the officers of the plaintiff, when the property was purchased, to institute a suit, if necessary, based upon the provisions of the agreement to prevent the operation of the quarry in violation of the provisions thereof.

Upon these facts, and others hereinafter mentioned, the court concluded that the plaintiff was entitled to an injunction against further violation of the terms of the agreement, but that it was not entitled to any damages on the ground that any right to damages had been waived by the Cooks in accepting royalties from the Quarry Company with full knowledge that the agreement had been violated.

Both parties have requested certain corrections and additions to the finding, but an examination of the evi-

dence discloses that no correction is permissible which will materially benefit either party.

The claims of the defendant resolve themselves into three fundamental questions: (1) That the words "quarry face" as used in the agreement under the circumstances, mean the entire face of the quarry; and that the agreement is not breached unless the entire face thereof shows from Mount Carmel Avenue; (2) that by accepting royalties from the Quarry Company with knowledge that the operations were being carried on so that some part of the quarry face could be seen from Mount Carmel Avenue, Mr. and Mrs. Cook had waived any right to insist upon a strict compliance with the covenant, and had precluded themselves from seeking redress; and that the plaintiff, having purchased the property with full knowledge, is in no better position than its predecessors in title and could not now be heard in equity to insist upon a strict compliance with the terms of the agreement; and (3) that the plaintiff, having purchased the property with the intention of bringing an action to enforce the terms of the agreement, has bought into a lawsuit, and as its action in so doing is champertous, it cannot seek the assistance of a court of equity.

By the language of the covenant, the Quarry Company agreed not "to take any rock at any point where the quarry face will show from Mount Carmel Avenue." This provision, the trial court construed to mean that no part of the face of the quarry opened on the leased premises should show from any point on Mount Carmel Avenue. If language is to have any meaning, it is difficult to see how the court could have otherwise construed this provision, having regard only to the language thereof. The double use of the word "any" applying both to "rock" and "point" is significant. "Any rock" does not mean all the rock; and

"any point" does not mean all the points. The coupling of this phrase with the agreement of the lessee not to take any rock out of the knoll known as the "Dumpling" reinforces the plaintiff's position. The elevation from the quarry floor to the highest point of the "Dumpling" being about one hundred and thirty-five feet, it is obvious that Mr. Cook, in making the lease, intended to confine the operations to such part of the mountain as would be screened from view by the "Dumpling," which allows rock to be taken for approximately one hundred and thirty-five feet above the present quarry floor without being visible from Mount Carmel Avenue. Nor can it be said that Mr. or Mrs. Cook placed a practical construction upon the contract in accordance with the defendant's claims. The only active thing that the Cooks did, as disclosed by the finding of the court, was to accept the amount of royalties and, from time to time, to urge the company to take out more rock. Beyond this, they did nothing. In view of the plain language of the covenant, it can hardly be said that these acts of the lessors constituted a practical construction of the contract as claimed by the defendant.

The second claim of the defendant is that the plaintiff's predecessors in title, by accepting the royalties with knowledge that the defendant was violating the terms of the covenant, have waived any right to insist upon a strict compliance therewith. The violation of the covenant was continuous as long as the quarrying operation went on so as to expose the face of the quarry from Mount Carmel Avenue. By accepting royalties, Mr. and Mrs. Cook waived any right to damages, as the court concluded, for past violations but did not waive the right to take action to prevent future violations. The court has specifically found that there was no intent on the part of the plaintiff

or its predecessors to waive any right to prevent future violations of the agreement. It is further found that no injury to the defendant has resulted because of any act or failure to act on the part of the plaintiff or its predecessors, and that the machinery and equipment installed in the leased premises by the defendant and its predecessors was not installed on the faith of anything done or omitted to be done by the plaintiff or its predecessors. Where the injury is continuing, acquiescence in past violation does not estop the victim from enjoining a future continuance thereof. A plaintiff is not debarred from equitable relief by mere delay unless the defendant has been in some way misled or injured thereby. Where injunctive relief is asked in support of a strict legal right, the party is entitled to it. A mere delay or acquiescence will not defeat the remedy unless there has been such a delay in the assertion of the claim as naturally to prejudice the party against whom the claim is set up. *Waterman* v. *Sprague Mfg. Co.,* 55 Conn. 554, 574, 12 Atl. 240; *Hartford* v. *Mechanics Savings Bank,* 79 Conn. 38, 41, 63 Atl. 658; *State ex rel. McClure* v. *Northrop,* 93 Conn. 558, 565, 106 Atl. 504; *Millard* v. *Green,* 94 Conn. 597, 611, 110 Atl. 177; *Galway* v. *Metropolitan Elevated Ry. Co.,* 128 N. Y. 132, 153, 28 N. E. 479; *London* v. *Tebo,* 246 Mass. 360, 362, 28 N. E. 479; *Menendez* v. *Holt,* 128 U. S. 514, 523, 9 Sup. Ct. 143; *McLean* v. *Fleming,* 96 U. S. 245, 257; *Attorney-General* v. *East Lake,* 11 Hare, 205, *228; 4 Pomeroy's Equity Jurisprudence (4th Ed.) §§ 1442-1445.

The third contention of the defendant is that the plaintiff, having bought the property with knowledge of the breach of the agreement by the defendant and for the purpose and with the intention of the preventing further breaches by suit, if necessary, is not entitled to relief in equity on the theory that the plain-

tiff's conduct is champertous. This claim cannot be sustained. The common law of champerty and maintenance has never been adopted in this State as applied to civil actions, and the true and exclusive inquiry and test of the right of the plaintiff to such relief from a court of equity is whether the transaction upon which it relies is opposed to public policy. *Rulnick* v. *Shulman,* 106 Conn. 66, 70, 136 Atl. 865; *Perry* v. *Puklin Co.,* 100 Conn. 104, 110, 123 Atl. 28; *Richardson* v. *Rowland,* 40 Conn. 565, 573. The true inquiry may, therefore, be limited exclusively to the question whether the contract is opposed to public policy. *Metropolitan Life Ins. Co.* v. *Fuller,* 61 Conn. 252, 261, 23 Atl. 193. There is nothing contrary to such public policy in the action of the plaintiff in buying this property for the purpose of enforcing a restriction of the covenant in the lease in order that a natural object of scenic attractiveness and interest might be preserved from destruction for the benefit of the public in the time that is to come.

There is no error.

In this opinion the other judges concurred.