606 F.2d 208
 204 U.S.P.Q. 99
 CA 79-3591 Irving S. SAVERSLAK, Individually and as Trustee
under Trust Agreement dated October 1, 1959, as
Amended, Plaintiff-Appellee, Cross-Appellant,
v.
DAVIS-CLEAVER PRODUCE COMPANY, a Missouri Corporation,
Defendant-Appellant, Cross-Appellee.
 Nos. 78-1711, 78-1712.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 13, 1979.
Decided Sept. 28, 1979.
 
 Jerome F. Fallon, Chicago, Ill., for Davis-Cleaver Produce Co.
 Anthony R. Chiara, Chicago, Ill., for Irving S. Saverslak.
 Before PELL and WOOD, Circuit Judges, and HOFFMAN, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 This appeal and cross-appeal arise from a diversity suit for breach of contract filed more than eight years ago. Defendant Davis-Cleaver Produce Company (Davis-Cleaver) appeals, and plaintiff Irving S. Saverslak (Saverslak) cross-appeals from the judgment entered in favor of Saverslak on April 27, 1978 for damages in the amount of $220,506.
 
 
 2
 The facts surrounding this dispute go back to the pioneer days in the development of the oven-roasted boneless turkey roll, now so common in supermarket freezers. In the 1950's, the plaintiff-cross-appellant, Saverslak, owned and operated a small neighborhood grocery and butcher shop in Chicago. During this period, Saverslak became interested in diversifying his business and experimented with various ways of producing a marketable turkey roll. Early versions of this product, however, were seriously flawed: The component pieces of turkey meat crumbled and separated when sliced. In 1958, after much trial and error, Saverslak developed a process that overcame this problem. Using this process, the turkey is deboned, and each piece dusted with wheat gluten, a high protein flour extract. The pieces are then fitted together, wrapped in the whole skin, sewn into a compact cylindrical roll, and baked. When subjected to regulated cooking temperatures, the wheat gluten acts as a binder, holding the pieces together and creating a compact product suitable for slicing.
 
 
 3
 Soon after, Saverslak applied for a patent and formed a corporation under the name "Maxlotte," which marketed in the Chicago area turkey rolls made using the wheat gluten process. In 1959 Davis-Cleaver, a Missouri poultry processing corporation, which had been experimenting with the production of turkey rolls, learned of the Saverslak wheat gluten method and in short order negotiated a twenty-year license to make and sell turkey rolls produced using this process. The agreement provided that in exchange for the use of Saverslak's trade secrets and patent rights Davis-Cleaver would pay Saverslak a royalty for each pound of licensed turkey roll sold. Among other restrictions, the agreement further contained three provisions that are now in issue. First, Davis-Cleaver agreed to affix the "Maxlotte" trademark to the labels of all turkey rolls sold under the license.[1] Second, a best efforts clause required that Davis-Cleaver exercise due diligence in marketing the licensed turkey rolls.[2] And third, Davis-Cleaver was to disclose and assign to Saverslak any new formulae, methods, or improvements for the manufacture and sale of the licensed products acquired during the term of the agreement.[3] Moreover, the agreement precluded Davis-Cleaver from engaging in the manufacture and sale of products similar to or competitive with wheat gluten turkey rolls.
 
 
 4
 From 1959 until 1970 the relationship between the parties was mutually profitable and, for the most part, cooperative. In 1959 Saverslak visited Davis-Cleaver's Quincy, Illinois plant and trained its production workers in the new process. That same year, Maxlotte purchased turkey rolls from Davis-Cleaver for distribution in the Chicago area. In 1961 Saverslak revealed to Davis-Cleaver his patented process for making a similar molded skinless turkey loaf bound with wheat gluten. Throughout this twelve-year period, Saverslak annually visited the Davis-Cleaver plant. In return, Saverslak received over $400,000 in royalties and enjoyed profits from the sale of turkey rolls marketed by Maxlotte under a license grant expressly authorized in the Davis-Cleaver agreement. All the while, Davis-Cleaver profitably sold turkey rolls produced pursuant to the license.
 
 
 5
 Yet the parties did encounter a few mild disputes. In 1961, for example, when Davis-Cleaver reduced the size of the "Maxlotte" trademark imprinted on its label, Saverslak wrote in a registered letter to Davis-Cleaver: "If you will increase the size of the printing of the word 'Maxlotte' . . ., I find no objection to the use of the aforesaid labels." Davis-Cleaver neither responded nor enlarged the trademark. Saverslak's final mention of this matter was in a letter from his attorneys to Davis-Cleaver in 1962, which merely noted: "We presume, of course, that the trademark specified in Article 22 of the agreement is being used on all packages."
 
 
 6
 In 1963 Davis-Cleaver eliminated the "Maxlotte" trademark from its labels, thereby intentionally breaching paragraph 22 of the license agreement.[4] Davis-Cleaver, however, made no attempt to hide the fact of its breach from Saverslak. Each year it provided him with a sample turkey roll with current labels attached. Nevertheless, despite his knowledge of the breach, Saverslak neither protested nor acknowledged in any way the elimination of the trademark until he commenced this litigation seven years later.
 
 
 7
 In 1967 Central Soya Corporation (Central Soya) purchased Davis-Cleaver and instructed its research division, Chemurgy, to develop an alternative process of making turkey rolls. During its initial research, Chemurgy discovered that another inventor had filed a patent for a wheat gluten turkey roll process sixteen months before Saverslak had filed. Davis-Cleaver urged at trial that all subsequent research was prompted by its apprehension that it might be liable for infringing the earlier patent. The trial court, however, concluded that Saverslak's process did not infringe the earlier patent, that such assertions created a spurious issue, and that the sole reason for Chemurgy's research was Central Soya's desire to avoid paying royalties to Saverslak. Central Soya accomplished this in 1970 when Davis-Cleaver abandoned the Saverslak process in favor of a salt extraction process.[5]
 
 
 8
 Shortly thereafter, Davis-Cleaver sought to surrender its rights under the license. In October 1970 it notified Saverslak that it had discontinued using the wheat gluten process and consequently would no longer pay royalties. Saverslak promptly rejected the attempted surrender and in December of that year attempted to unilaterally amend the license agreement by excising three paragraphs that presented antitrust and patent law problems.[6] Davis-Cleaver rejected the amendment and declared the contract void and unenforceable from its inception.
 
 
 9
 In January 1971 Saverslak filed suit, claiming that by substituting the salt extraction process for the wheat gluten method and eliminating royalty payments Davis-Cleaver intentionally breached the best efforts (paragraph 13) and assignment of new methods (paragraph 25) clauses. The complaint further alleged that Davis-Cleaver's non-use of the Maxlotte trademark was a breach of paragraph 22.
 
 
 10
 In a memorandum opinion dated November 29, 1974,[7] Judge McGarr found that Davis-Cleaver was not obligated under paragraph 25 to disclose and assign its salt extraction process to Saverslak. Judge McGarr read paragraph 25 to cover only new formulae, methods, improvements, and the like related to the wheat gluten process. The court then found that such a relation did not exist between the wheat gluten and salt extraction processes. The court also found that Davis-Cleaver did not breach paragraph 13, construing it to require best efforts in the exploitation, manufacture, and sale of the wheat gluten turkey rolls only as long as Davis-Cleaver was using the wheat gluten process.
 
 
 11
 Judge McGarr concluded, however, that Davis-Cleaver breached paragraph 22 when it eliminated the "Maxlotte" trademark from its turkey roll labels. In awarding damages, the court rejected Davis-Cleaver's argument that Saverslak's seven-year silence and receipt of royalties in the face of this obvious breach constituted a waiver of his paragraph 22 rights. Finding merit in this argument, we address it first.
 
 I.
 
 12
 Davis-Cleaver eliminated the "Maxlotte" trademark from its turkey roll labels in 1963. Saverslak, however, despite full knowledge of the breach and ample opportunity to protest, did not seek to enforce paragraph 22 until 1970. In the interim the parties carried on a normal business relationship, which included frequent and regular communication. Most notably, Saverslak annually visited the Davis-Cleaver plant, at which time Davis-Cleaver presented him with a sample turkey roll with current labeling attached. Yet, until this suit, Saverslak said nothing, choosing instead to silently acquiesce in the marketing of the Davis-Cleaver product without the "Maxlotte" trademark and to collect more than $400,000 in royalties.
 
 
 13
 The trial court in its memorandum opinion noted that "the defense of waiver or estoppel is unjustified under the circumstances." No. 71-C-810 at 16. The court apparently predicated this conclusion on its finding that Saverslak was not injured by the omission of the trademark until 1970 when Davis-Cleaver terminated the license agreement.[8] Under this analysis, Saverslak did not waive his right to sue for damages because he filed suit within a few months of incurring injury.
 
 
 14
 Saverslak attempts to bolster the trial court's rationale, asserting that despite his seven-year silence he did not waive his right to recover damages, but rather merely forfeited the right to Repudiate the license agreement for breach of paragraph 22. He quotes various treatises, which at least facially support his contention. See 17 Am.Jur.2d, Contracts § 447 (1964); 3A Corbin on Contracts § 766 (1960); 5 Williston on Contracts § 683 (3d ed. 1961). These passages, however, are inapposite because they deal not with waiver, but with the election of rights by a non-breaching party faced with a nonconforming tender that is also a condition precedent to his duty to perform. A non-breaching party faced with the dilemma of whether to perform in the face of the other party's breach may elect to avoid the contract or treat the contract as in full force and retain the right to sue for damages arising from the breach. Kentucky Natural Gas Corp. v. Indiana Gas & Chemical Corp., 129 F.2d 17, 19 (7th Cir.), Cert. denied, 317 U.S. 678, 63 S.Ct. 161, 87 L.Ed. 544 (1942). See also Denison Mines Ltd. v. Michigan Chemical Corp., 469 F.2d 1301 (7th Cir. 1972). This was precisely the election facing Saverslak in 1963 when Davis-Cleaver ceased using the "Maxlotte" trademark. Saverslak's initial silence coupled with his receipt of royalties was an election to treat the contract as in full force. Admittedly, Saverslak at that point retained the right to sue for damages arising from the breach. But that right did not survive indefinitely.
 
 
 15
 Inquiry into the effect of his continued silent acceptance of benefits is necessary to determine whether the right survived the commencement of this suit.[9] The principles of waiver and estoppel support the notion that a party to a contract may not lull another into a false assurance that strict compliance with a contractual duty will not be required and then sue for non-compliance. See Advanced Hydraulics, Inc. v. Otis Elevator Co., 525 F.2d 477 (7th Cir.), Cert. denied, 423 U.S. 869, 96 S.Ct. 132, 46 L.Ed.2d 99 (1975); Continental Coatings Corp. v. Metco, Inc., 464 F.2d 1375 (7th Cir. 1972); Graubremse GMBH v. Berg Mfg. & Sales Co., 417 F.2d 1201 (7th Cir. 1969). However, despite the frequency with which they are used interchangeably, the two principles often address different factual settings.
 
 
 16
 Analysis of the applicability of waiver focuses on the intent of the non-breaching party. If he has intentionally relinquished a known right, either expressly or by conduct inconsistent with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement. Pierce v. MacNeal Memorial Hospital Ass'n, 46 Ill.App.3d 42, 52, 4 Ill.Dec. 615, 625, 360 N.E.2d 551, 559 (1st Dist. 1977); John Kubinski & Sons, Inc. v. Dockside Development Corp., 33 Ill.App.3d 1015, 1020, 339 N.E.2d 529, 533 (1st Dist. 1975); 5 Williston on Contracts § 678 (3d ed. 1961 & Supp.1979). In a contractual setting, as here, waiver occurs when an obligor manifests an intent not to require an obligee to strictly comply with a contractual duty. Graubremse GMBH v. Berg Mfg. & Sales Co., 417 F.2d at 1204-05; Stewart v. Meyers, 353 F.2d 691, 694 (7th Cir. 1965); Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1, 7 (7th Cir.), Cert. denied, 338 U.S. 948, 70 S.Ct. 486, 94 L.Ed. 584 (1949); Hubshman v. Louis Keer Shoe Co., 129 F.2d 137, 140 (7th Cir. 1942); John Kubinski & Sons, Inc. v. Dockside Development Corp., 33 Ill.App.3d at 1019-20, 339 N.E.2d at 533-34.
 
 
 17
 Estoppel, on the other hand, focuses not on the obligor's intent, but rather on the Effects of his conduct on the obligee. Justice Clark, writing for this court in Advanced Hydraulics, 525 F.2d at 479, crystalized the distinguishing characteristic. An estoppel, he noted, arises only when a party's conduct misleads another to believe that a right will not be enforced and causes him to act to his detriment in reliance upon this belief. Id. (quoting Lebold v. Inland Steel Co., 125 F.2d 369, 375 (7th Cir.), Cert. denied, 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749 (1941)); See 5 Williston on Contracts § 691 (3d ed. 1961 & Supp.1979). Even if the obligor has not waived a known right, he may be estopped from enforcing it.[10]
 
 
 18
 In light of the preceding distinction, we hold that Saverslak waived his rights under paragraph 22 and therefore may not recover damages for Davis-Cleaver's non-use of the "Maxlotte" trademark.[11] Regardless of the soundness of the trial court's conclusion that Saverslak was not injured until 1970, which we seriously question,[12] the trial court's rationale evades the test for determining whether Saverslak waived his paragraph 22 rights. The test is simply whether he intentionally relinquished a known right.
 
 
 19
 In 1963, when Davis-Cleaver eliminated the "Maxlotte" trademark from its label, Saverslak held a contractual right to enforce Davis-Cleaver's use of the trademark. Saverslak continued to hold this right during at least the initial part of the seven-year period during which he silently accepted royalties. At some point, however, which we need not fix, Saverslak's silent acquiescence ripened into an intentional relinquishment of his right to enforce the trademark use. The questions whether and when he suffered damages are simply irrelevant[13] because Saverslak did not retain an underlying contract right upon which to base damages.
 
 
 20
 Initially, when Davis-Cleaver diminished the size of the "Maxlotte" trademark, Saverslak's written objections evidenced his intent to enforce his paragraph 22 rights. However, from 1963, when Davis-Cleaver finally eliminated the trademark, until 1970, when Saverslak brought suit, there was not even a hint of protest in the face of this open breach of contract. This seven-year period of silent acquiescence in the face of ample opportunity to protest alone evinces Saverslak's intent to relinquish a known right. The acceptance of royalties makes that intent crystal clear.[14]
 
 
 21
 Alternatively, we hold that regardless of whether Saverslak waived his paragraph 22 rights, he is estopped from enforcing them. We may reasonably assume that Saverslak's silent acquiescence and acceptance of royalties led Davis-Cleaver to believe that paragraph 22 would no longer be enforced and that it could safely continue to omit the trademark. Had Saverslak instead raised a timely objection the matter might have been resolved with minimum expense and effort. Under these circumstances, we cannot allow him to cash in on the false assumption he created and on which the defendant relied to its detriment.
 
 II.
 
 22
 Saverslak contends in his cross-appeal that Davis-Cleaver's discontinuance in 1970 of the wheat gluten process in favor of the salt extraction process was a breach of the best efforts clause. Paragraph 13 requires that Davis-Cleaver "proceed with diligence and . . . exert its best efforts in the exploitation, manufacture and sale of the licensed products, and in all ways and to the best of its ability . . . promote the sale of the licensed products throughout the licensed territory and supply the market therefor." The parties do not dispute that when Davis-Cleaver ceased using the wheat gluten process it was no longer exerting its best efforts to market the licensed turkey rolls. Consequently, we are faced with the question whether Davis-Cleaver's paragraph 13 duties extend beyond the occurrence of that event.
 
 
 23
 Although the license agreement extends for twenty years, the trial court interpreted paragraph 13 as creating a duty to use best efforts to market wheat gluten turkey rolls only as long as Davis-Cleaver continues to sell that product. Following this line of reasoning, the best efforts clause became inapplicable when Davis-Cleaver shifted to another production method. The unique facts of this case compel us to agree.
 
 
 24
 Many of the provisions of the 1959 agreement are expressly subject to the twenty-year term of the agreement; however, paragraph 13 makes no mention of its duration. This omission gives rise to an interpretive ambiguity, the resolution of which is determinative of the question posed above. Paragraph 13 either imposes a duty to exert best efforts throughout the twenty-year term of the agreement or, as the trial court found, only as long as Davis-Cleaver is actually selling wheat gluten turkey rolls. In resolving this ambiguity we look to the intent of the parties in including paragraph 13 within their agreement.
 
 
 25
 The most reliable evidence of that intent is the 1959 agreement viewed as a whole. Our construction of the agreement begins with paragraph 20, which provides that Davis-Cleaver "shall not manufacture, sell or offer to sell any other products competitive with, similar or equivalent to the licensed products." Davis-Cleaver contends, and Saverslak does not dispute that this exclusive use provision is unlawful because of antitrust and patent law problems, which we need not address. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 136, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); International Salt Co. v. United States, 332 U.S. 392, 395-96, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 455-59, 60 S.Ct. 618, 84 L.Ed. 852 (1940).
 
 
 26
 In an attempt to purge the agreement of these problems, Saverslak in his letter of December 4, 1970 to Davis-Cleaver wrote: "Paragraph 20 . . . shall be and is hereby cancelled and deleted." These words though ineffective as an amendment because Saverslak acted unilaterally are effective as a waiver. See pp. 212-213 Supra. Our construction of paragraph 13 therefore proceeds in light of Saverslak's waiver of paragraph 20. When the parties formed the 1959 agreement, paragraphs 13 and 20 together created Davis-Cleaver's duty (1) to exert best efforts to market the wheat gluten turkey roll, (2) which was the only turkey roll or similar product that it could market. Each paragraph served a distinct purpose. Paragraph 20 ensured that Davis-Cleaver would market the wheat gluten turkey roll and none other. Paragraph 13, on the other hand, ensured that Davis-Cleaver would diligently exploit that product. Since paragraph 20 restricted Davis-Cleaver's transactions in similar or competitive products, it seems to us that the parties did not intend that paragraph 13 be applied in a manner that would accomplish the identical result.
 
 
 27
 In reaching this conclusion we are cognizant of the well-established rule that a court should not construe a contract in such a way as to leave any of its provisions without substance. But Saverslak would have us interpret paragraph 13 as accomplishing the same result he initially sought under paragraph 20. It follows from his interpretation that the very manufacture and sale of salt extraction process turkey rolls would be forbidden by paragraph 13 on the theory that one cannot exert best efforts to exploit a wheat gluten turkey roll and simultaneously market a commercially indistinguishable competing product.[15] Consequently, if we were to interpret paragraph 13 to extend beyond the time Davis-Cleaver in fact used the wheat gluten process, that paragraph would effectively restrain Davis-Cleaver from marketing similar or competitive products. This is, of course, precisely what Saverslak sought to do when he inserted paragraph 20 in the agreement. To attribute to paragraph 13 a similar purpose would rob paragraph 20 of all substance.
 
 
 28
 We cannot construe the 1959 agreement in the same way we might have construed it had Saverslak not waived paragraph 20. Accordingly, we affirm the trial court's interpretation of paragraph 13 as imposing a duty on Davis-Cleaver to exert best efforts to market the wheat gluten turkey roll only as long as it sells that product. Upon shifting to the salt extraction process, its duty under the 1959 agreement to exert best efforts to market wheat gluten turkey rolls was suspended.
 
 III.
 
 29
 The final question we address is the scope of the grant-back clause. Paragraph 25 of the 1959 agreement provides in pertinent part[16]:
 
 
 30
 Any and all new formula, methods, process, invention, improvement, application and/or patent For the manufacture and sale of the licensed products, made, invented or acquired by Licensee during the term hereof, shall be disclosed promptly to Licensor, and shall without compensation to Licensee, immediately become and be the sole property of Licensor . . . . (emphasis added)
 
 
 31
 Saverslak contends that Davis-Cleaver breached paragraph 25 when it failed to disclose and assign to him its rights in the salt extraction process.
 
 
 32
 The trial court read paragraph 25 to be limited by its terms to improvements and the like pertaining to the Saverslak wheat gluten process. Accordingly, the court held Davis-Cleaver was under no duty to disclose and assign its rights in the salt extraction process to Saverslak.
 
 
 33
 This result is simply a straightforward application of the terms of paragraph 25, which expressly limit its scope to new developments in the "manufacture and sale of the licensed products . . . ." Since the products licensed under the 1959 agreement are limited to Wheat gluten turkey rolls,[17] paragraph 25 is inapplicable to the unrelated salt extraction process turkey rolls. In light of the clarity with which the terms of paragraph 25 resolve this claim, the questionable evidence of the parties' intent presented by Saverslak is irrelevant.
 
 
 34
 The judgment of the district court awarding damages in the amount of $220,506 for breach of paragraph 22 the trademark use provision is reversed. We affirm in all other respects.
 
 
 
 *
 The Honorable Walter E. Hoffman, Senior Judge from the United States District Court for the Eastern District of Virginia, is sitting by designation
 
 
 [1]
 Paragraph 22 of the license agreement reads:
 All packages containing the licensed products shall have imprinted thereon the trademark "Maxlotte". The style and form of such packaging shall be subject to the written approval of Licensor and after such approval thereof by Licensor, said packaging shall not be changed by Licensee without Licensor's prior written consent. All advertising of the licensed products shall also be submitted to and approved by Licensor.
 
 
 [2]
 Paragraph 13 reads:
 Licensee agrees that it will proceed with diligence and will exert its best efforts in the exploitation, manufacture and sale of the licensed products, and in all ways and to the best of its ability will promote the sale of the licensed products throughout the licensed territory and supply the market therefor.
 
 
 [3]
 Paragraph 25 reads:
 Any and all new formula, methods, process, invention, improvement, application and/or patent for the manufacture and sale of the licensed products, made, invented or acquired by Licensee during the term hereof, shall be disclosed promptly to Licensor, and shall without compensation to Licensee, immediately become and be the sole property of Licensor, with the same force and effect as if the same were owned or controlled by Licensor at the date hereof; and Licensee shall on demand of Licensor, and without compensation, execute such applications for letters patent, assignments and other instruments as Licensor may require in order to vest in Licensor the entire legal and equitable title and interest in and to such formula, methods, process, invention or improvements. The provisions hereof shall be applicable to and govern any such new formula, method, process, invention or improvement.
 
 
 [4]
 See note 1 Supra
 
 
 [5]
 A salt slurry is injected into the turkey roll prior to baking. The salt draws out the meat's natural proteins, which act as a binder. Sugar is then added to the meat to mask the somewhat unpleasant taste created by the salt
 
 
 [6]
 In a letter to Davis-Cleaver dated December 4, 1970, Saverslak sought to excise paragraph 20, which prohibits Davis-Cleaver from producing or selling similar or competitive products. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 136, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); International Salt Co. v. United States, 332 U.S. 392, 395-96, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 455-59, 60 S.Ct. 618, 84 L.Ed. 852 (1940). For the text of paragraph 20, see p. 215 Infra. The two other provisions Saverslak sought to excise are not relevant to this appeal
 
 
 [7]
 Saverslak v. Davis-Cleaver Produce Co., No. 71-C-810 (N.D.Ill., Nov. 29, 1974)
 
 
 [8]
 The trial court reasoned as follows:
 If the Maxlotte trademark had been prominently displayed on all Davis-Cleaver labels throughout the life of the Saverslak/Davis-Cleaver relationship as required by the contract existing between the parties, defendant's customers would have identified the wheat-glutin (sic) process oven-roasted, boneless turkeys manufactured under the Saverslak process with the name Maxlotte. When, after termination of the license agreement and the utilization by defendant of a different process, the Maxlotte trademark disappeared from its product, Saverslak could have reached and sold to defendant's former customers who could have identified him with the Maxlotte process. It is quite possible that Saverslak could have mounted a successful merchandising program predicated upon the superiority of the wheat-glutin (sic) process under the Maxlotte name, to the new Davis-Cleaver process which involved an excess of salt in order to avoid a patent, which salt was subsequently masked with a sweetener. Defendant's failure to live up to its contract obligation to prominently display the Maxlotte trademark and to reinforce the identification of the wheat-glutin (sic) process with the Maxlotte name has deprived the plaintiff Saverslak of this competitive and marketing advantage.
 No. 71-C-810 at 15-16.
 
 
 [9]
 Whether the facts proven are sufficient to constitute a waiver is a question of law and, therefore, properly before this court for review. Graubremse GMBH v. Berg Mfg. & Sales Co., 417 F.2d 1201, 1204 (7th Cir. 1969); Stewart v. Meyers, 353 F.2d 691, 694 (7th Cir. 1965)
 
 
 [10]
 Cf. Sleeping Giant Park Ass'n v. Connecticut Quarries Co., 115 Conn. 70, 160 A. 291 (1932), which involves facts strikingly similar to those now in issue, aptly illustrates the waiver-estoppel distinction. In that case, defendant's predecessor in title agreed to pay royalties of two cents for each cubic yard of rock quarried from plaintiff's predecessor's land. The agreement, however, expressly forbade the quarry company from taking rock from any point visible from the street. Notwithstanding this restriction, the company's operations left the quarry face visible from the street for at least nine years prior to commencement of suit. During this period, the plaintiff's predecessor continuously observed the quarry operations and collected appropriate royalties without objection to the company's non-compliance with the restriction. Accordingly, the court held that the acceptance of royalties coupled with silence in the face of knowledge of non-compliance waived any right to damages for past violations. Further finding that the company did not detrimentally rely on the silent acquiescence the mining equipment had been installed prior to straying into the restricted area the court noted that the plaintiff was not estopped from proceeding in equity to enjoin future violations, presumably because he had revived his rights. See note 11 Infra
 
 
 [11]
 We do not address the question whether Saverslak could have revived his paragraph 22 rights by a timely rescission of his waiver because there is no suggestion in the record that he ever sought to have Davis-Cleaver replace the "Maxlotte" trademark on its label
 
 
 [12]
 Saverslak, more likely, was injured in 1963. Before removal, the trademark had been accumulating at least a small recognition value by being associated in the public eye with the Davis-Cleaver product. After removal, however, the trademark no longer grew in value, and any value it had accumulated began to dissipate
 
 
 [13]
 If the time of injury served as the benchmark for determining waiver, a party conceivably could sit on his rights indefinitely regardless of the foreseeability of future damages, lull the other party into continuing his non-compliance, and then sue for damages. Such a result would leave only a shell where waiver once stood as a good defense
 
 
 [14]
 See Graubremse GMBH v. Berg Mfg. & Sales Co., 417 F.2d at 1205, in which this court found that a vendor's acceptance of benefits including receipt of the full purchase price under a sales contract was "inconsistent with any claim of continued reliance on the contractual requirement (that the vendee had breached)." The court further noted that the vendor's continued performance "manifested (his) intention to waive the requirement." Id. Cf. Kirkpatrick v. Petreikis, 44 Ill.App.3d 575, 577, 3 Ill.Dec. 281, 283, 358 N.E.2d 679, 680 (3d Dist. 1976) (acceptance of late payments without protest waives time of the essence clause)
 
 
 [15]
 The products of the wheat gluten and salt extraction processes are so nearly identical that Davis-Cleaver found it unnecessary to even notify its wholesale customers of the adoption of the latter process
 
 
 [16]
 For the full text of paragraph 25, see note 3 Supra
 
 
 [17]
 Paragraph 9(A) defines "licensed products" as roast breast of turkey, boneless roast turkey, and smoked turkey "manufactured and sold by Licensee during the term hereof, and embodying Licensor's formula, secret process, methods, invention and trade secret . . . ."