896 F.Supp. 766 (1995)
Barry W. SUFRIN, Plaintiff,
v.
Gerald D. HOSIER, Defendant.
No. 94 C 608.
United States District Court, N.D. Illinois, Eastern Division.
August 7, 1995.
*767 Ray G. Rezner, Robert Eliot Shapiro, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for plaintiff.
Paul K. Vickrey, Hopkins & Sutter, P.C., Chicago, IL, Raymond P. Niro, Timothy J. Haller, Raymond Pardo Niro, Jr., Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for defendant.

MEMORANDUM OPINION
BRIAN BARNETT DUFF, District Judge.
On January 31, 1994, Barry W. Sufrin ("Sufrin") sued Gerald D. Hosier ("Hosier") for, among other things, breach of contract. On June 28, 1994, Hosier moved in limine or, in the alternative, for summary judgment. For the reasons discussed below, we deny his primary and alternative motions.

I. Background
In January 1984, Hosier and Sufrin established the law firm Hosier & Sufrin ("H & S"). Pl.'s R. 12(N)(3)(b) at 2. On January 10, 1984, Sufrin proposed a formula to govern the division of the firm's revenues. Pl.'s Br. at Ex. E. In part, the formula provided that Hosier's income would equal "[b]illings less overhead + 25% of [Sufrin's] billings less overhead[,] + 67% of residual profits," and Sufrin's income would equal "75% of billings[1] less overhead, [+] 33% of residual profits." Id. On January 21, 1984, Hosier agreed to the proposal ("the Agreement"). Id. On March 5, 1984, the State of Illinois certified H & S as a professional corporation ("PC"). Compl. at Ex. C.
Some time in early 1984, Telesonics Systems, Inc., ("Telesonics") discussed with Hosier "the prospect of [his] representing [it]." Hos.Dep. at 166. On April 4, 1986, Telesonics hired Hosier on a contingent fee basis "to license the television industry under Telesonics' stereo-television sound patents." Pl.'s Br. at Ex. H. In 1987, Telesonics received a settlement from the industry, and the settlement led to a "plan of royalty distribution." Pl.'s Br. at Ex. G. Under the plan, Hosier received a 38.5% interest, and Sufrin received a 1% interest. Id.
From 1988 to 1989, "Hosier entered into a series of agreements with an inventor, Jerry Lemelson ("Lemelson"), under which Lemelson retained [H & S] on a contingency fee basis to pursue his rights under a variety of patents." Pl.'s Br. at 4. The number of agreements is unclear. When Sufrin learned about the agreements is also unclear, yet by 1989, he became involved in at least one of them, the Mattel case.
In January 1990, Sufrin resigned from H & S. The firm dissolved, but "Hosier carried on the Lemelson matters for which [H & S] had been retained," and his "contingent compensation swelled to $150 million or more." Pl.'s Br. at 6. Hosier and Sufrin did not wind up the firm's affairs. Who is entitled to what amount of the contingent fees?

II. Discussion

A. Does the Agreement Govern the Entitlement?
In Ellerby v. Spiezer, 138 Ill.App.3d 77, 92 Ill.Dec. 602, 485 N.E.2d 413 (2nd Dist.1985), the plaintiff sued for an accounting of her law partnership with the defendants after it dissolved. The firm represented clients on a contingency fee basis, and after it dissolved, it realized profits from some of them. The firm, however, made no arrangements for the post-dissolution distribution of the profits. The court stated that *768 the "issue[ ] reduce[d] to the question of how, in the absence of an agreement on the subject, the post-dissolution profits from the contingency fee cases should be distributed." Id. at 80, 92 Ill.Dec. 602, 485 N.E.2d 413.
The court decided that the resolution of that issue lay in the Uniform Partnership Act ("UPA"). Id. The UPA provided that the "[d]issolution of the partnership did not terminate it; rather, the parties [remained] partners until [they] [wound] up ... their partnership affairs." Id. Specifically, they remained partners until they wound up "the pending cases the partnership agreed to handle on a contingency fee basis." Id. at 81, 92 Ill.Dec. 602, 485 N.E.2d 413. Until then, "[t]he fees from those cases [were] ... assets of the partnership." Id. "Since there was no showing that the partners agreed to change the distribution of profits after dissolution ..., the distribution formula in effect at the time of the dissolution remain[ed] in effect." Id. at 83, 92 Ill.Dec. 602, 485 N.E.2d 413. Therefore, the court held that "the partners w[ere] entitled to share in the remaining profits in accordance with the terms of their partnership agreement." Id. at 84, 92 Ill.Dec. 602, 485 N.E.2d 413.
Is Ellerby inapposite because it concerned a law partnership rather than a PC? In Fox v. Abrams, 163 Cal.App.3d 610, 210 Cal.Rptr. 260 (2nd Dist.1985), the court addressed a similar question. There, "[i]n 1976, the parties[2] [practiced] law together [at AFGO,] ... a law corporation." Id. at 612, 210 Cal.Rptr. 260. "Relations between the parties broke down, and, on May 6, 1976, Fox resigned." Id. Before Fox resigned, he "actively [worked] on a number of [AFGO's] pending cases, mostly personal injury and wrongful death." Id. After he resigned, numerous of the clients involved in those pending cases substituted AFGO out and him in as the attorney of record. The court stated that the case "primarily concern[ed] the parties' rights and obligations in the fees subsequently received for the cases which were in [progress] on the date[] of [his] resignation[]." Id.
To analyze the case, the court revisited Jewel v. Boxer, 156 Cal.App.3d 171, 203 Cal. Rptr. 13 (1st Dist.1984), which "shows the proper way to resolve the instant dispute." Id. 210 Cal.Rptr. at 263. "In [Jewel], four attorneys ... practiced law together in a partnership. They dissolved the partnership and formed two new firms.... Each of the new law firms took a portion of the former firm's active cases, and the clients involved executed the appropriate substitutions of attorney." Id. Following the UPA, the Jewel court held that fees from the former firm's active cases should "be allocated to the former partners according to their right to fees in the former partnership." Id.
Fox argued that Jewel "is a partnership case which should have no application because this case involves a [corporation]." Id. 210 Cal.Rptr. at 264. The Fox court disagreed:
First, [Jewel] was not based solely on partnership law but also cited "sound policy reasons" for its decision. "The rule prevents partners from competing for the most remunerative cases during the life of the partnership in anticipation that they might retain those cases should the partnership dissolve. It also discourages former partners from scrambling to take physical possession of files and seeking personal gain by soliciting a firm's existing clients upon dissolution.... On balance, the allocation of fees according to each partner's interest in the former partnership should not work an undue hardship as to any partner where each partner completes work on the partnership's cases which are active upon its dissolution."
....
[Second,] [Jewel] is also based in part upon fiduciary obligations of law partners.... There is no reason to hold that when lawyers decide to practice together in corporate form rather than partnership, they are relieved of fiduciary obligations toward each other with respect to the corporation's business.... [A]ttorneys practicing together in a law corporation owe each other fiduciary duties very similar to those owed by law partners, and therefore the fact that a law corporation is involved *769 is no reason to disregard the fair and reasonable principles of [Jewel] or to interpret the parties' agreement in a manner favoring one group over another.
Id. 210 Cal.Rptr. at 265-6 (citation omitted). Finally, "[a]pplying these principles to the facts of this case, we conclude that the work in pro[gress] should be considered unfinished business of the former firm and that the fees derived from such cases should be divided on the basis of a [Jewel] formula," which is to say, a UPA formula. Id. 210 Cal.Rptr. at 266.
Other jurisdictions support the Fox court's view. See, e.g., DelCasino v. Koeppel, 207 A.D.2d 374, 615 N.Y.S.2d 454, 455 (2nd Dept. 1994) (stating that "[a]bsent agreement, both parties are entitled to recover their share of the fees that the corporation earns from pending contingency fee cases"); Sullivan, Bodney & Hammond v. Bodney, 16 Kan. App.2d 208, 820 P.2d 1248, 1251 (1991) (stating that "Jewel and Fox are persuasive authority and establish a trend by courts in dealing with the issue before us"); but see Langhoff v. Marr, 81 Md.App. 438, 568 A.2d 844, 853 (Md.Ct.Spec.App.1990) (stating that "the dissolution of [PCs] is governed by the general corporate law and not the [UPA]"), vacated, 322 Md. 657, 589 A.2d 470, 474 (Md.Ct.App.1991) (stating that "[i]t is unnecessary in this case to decide whether a partnership or corporate model applies").
We believe that if an Illinois court heard this case, it would also support the Fox court's view. See Koestner v. Wease & Koestner Jewelers, Inc., 63 Ill.App.3d 1047, 1049-50, 21 Ill.Dec. 76, 381 N.E.2d 11 (3rd Dist.1978). Therefore, H & S's work in progress at the time the firm dissolved is unfinished business and the fees derived from that work should be divided pursuant to a UPA formula. As in Ellerby, that means that the fees should be divided pursuant to "the distribution formula in effect at the time of the dissolution." 138 Ill.App.3d at 83, 92 Ill.Dec. 602, 485 N.E.2d 413. In turn, that means that the Agreement governs the entitlement. At least, it does unless Hosier's arguments and defenses are persuasive.

B. Hosier's Arguments and Defenses

1. The Professional Responsibility Argument
Hosier argues that Sufrin's claim violates the Illinois prohibition on attorney fee-sharing. Sufrin seeks to share in fees Hosier received while the two no longer practiced at the same firm. Def.Br. at 13. Hosier argues that such sharing would violate the Illinois Code of Professional Responsibility's Rule 2-107.[3]Id. at 11-2; See Kaplan v. Pavalon & Gifford, 12 F.3d 87, 90 (7th Cir. 1993). Consequently, Hosier argues that Sufrin is not entitled to recover any post-January 1990 contingent-fees.
In Ellerby, the court rejected a similar argument. The court explained:
The clients of the partnership were free to be represented by any member of the dissolved partnership or by other attorneys of their choice. This right of the client is distinct from and does not conflict with the rights and duties of the partners between themselves with respect to the profits from unfinished partnership business since, once the fee is paid to an attorney, it is of no concern to the client how the fee is distributed among the attorney and his partners. This does not result in improper fee splitting ... since ... the partnership continues until the winding up of the partnership affairs has been completed, and it is perfectly proper for law partners to split fees among themselves.
138 Ill.App.3d at 81, 92 Ill.Dec. 602, 485 N.E.2d 413.
In this case, Hosier and Sufrin did not wind up their affairs, and they remain partners until they do so. As the Ellerby court explained, Rule 2-107 is inapplicable to partners. Therefore, Hosier's argument is unpersuasive.

2. The Quantum Meruit Argument
Hosier argues that the "withdrawing attorney on a contingency fee case is limited to payment for his services on a quantum meruit basis." Def.Rep.Br. at 5. Sufrin *770 changed firms and, when he did, he "refused to represent Lemelson on a contingent fee basis." Id. Hosier argues that it is improper for Sufrin to refuse to represent Lemelson and then to return to collect Lemelson's fee. According to Hosier, Sufrin "did nothing  took no risk, did no work  and expected Hosier to become his slave." Id. Consequently, Hosier argues that the "logical and equitable" result is for Sufrin to receive a fee equivalent to the reasonable value of his services. Id. at 7.
The Jewel court rejected a similar argument. It stated that, "[a]t first glance, strict application of the rule against extra compensation might appear to have unjust results (e.g., where a former partner obtains a highly remunerative case just before dissolution, and nearly all work is performed after dissolution)." 156 Cal.App.3d at 179, 203 Cal. Rptr. 13. "But undue hardship should be prevented by two basic fiduciary duties owed between the former partners. First, each former partner has a duty to wind up and complete unfinished business of the dissolved partnership.... Second, no former partner may take any action with respect to any unfinished business which leads to purely personal gain." Id.; see Ellerby, 138 Ill. App.3d at 81-2, 92 Ill.Dec. 602, 485 N.E.2d 413 (echoing these statements). The court concluded that, "[i]f there is any disproportionate burden of completing unfinished business here, it results from the parties' failure to have entered into a partnership agreement which could have assured such a result would not occur. The former partners must bear the consequences of their failure to provide for dissolution in a partnership agreement." Id.
We agree with the Jewel court's view, and we reject the McDonald v. Trans Atlas Marine Corp., 1993 WL 133840 (E.D.La. April 19, 1993) court's contrary view. Although the Jewel court's view does not necessarily produce the most equitable or logical result, we are most concerned with the former partners' fiduciary duties. The former partners were aware of their duties, and they could have avoided a potentially inequitable or illogical result if they satisfied those duties. They failed to do so, however, and, as the Jewel court, we believe that they must now bear the consequences of that failure. Therefore, Hosier's argument is unpersuasive.

3. The Waiver Defense
Hosier argues that Sufrin waived his right to contingent fee recoveries under the Agreement. "There was an `open breach' of the [Agreement] in 1987, when Sufrin agreed to accept a 1% interest in the Telesonics contingent-fee recoveries. Though Sufrin purportedly believed that the Telesonics distribution violated the Agreement, he voiced no protest, and never stated that belief to Hosier." Def.Br. at 8. Hosier continues: "In fact, Sufrin did not raise any claim that the Agreement entitled him to a share of contingent fees until a meeting with Hosier's attorney in late 1992." Id. at 9. Consequently, Hosier argues that "[t]hat five-year silence evidences ... Sufrin's intentional relinquishment [of] the purported right to contingent-fee recoveries under the Agreement." Id.
In Saverslak v. Davis-Cleaver Produce Co., 606 F.2d 208 (7th Cir.1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980), the Seventh Circuit considered a similar argument. In that case, the defendant "eliminated the `Maxlotte' trademark from its turkey roll labels in 1963. [The plaintiff], however, despite full knowledge of the breach and ample opportunity to protest, did not seek to enforce [the operative contractual provision] until 1970." Id. at 212. Instead, the plaintiff "said nothing, choosing instead to silently acquiesce in the marketing of the [defendants'] product without the `Maxlotte' trademark  and to collect more than $400,000 in royalties." Id.
Based on those facts, the court stated that "[i]nquiry into the effect of [the plaintiff's] continued silent acceptance of benefits is necessary to determine whether the right survived the commencement of this suit." Id. at 213. It further stated that "[w]hether the facts proven are sufficient to constitute waiver is a question of law." Id. at n. 9. "Analysis of the applicability of waiver focuses on the intent of the non-breaching party. If he has intentionally relinquished a known right, either expressly or by conduct inconsistent *771 with an intent to enforce that right, he has waived it and may not thereafter seek judicial enforcement." Id. at 213. "In a contractual setting, ... waiver occurs when an obligor manifests an intent not to require an obligee to strictly comply with a contractual duty." Id.
In this case, the facts proven are insufficient to establish that Sufrin intentionally relinquished a known right. It is unclear whether the Telesonics payout arose under the Agreement. Suf.Dep. at 40. If it did not, Sufrin's acceptance of the payout had no impact on his rights under the Agreement. Moreover, Saverslak differs from this case. There, the facts proven revealed that the contract's provision was clear. Here, however, the contract's provision is unclear. Therefore, Hosier's argument is unpersuasive.

4. The Estoppel Defense
Hosier argues that "Sufrin led [him] to believe [that] he would never enforce any purported right to share in contingent-fee recoveries." Def.Br. at 9. "Sufrin openly admitted that, despite his purported belief in 1987 that the Agreement gave him 33% of any Telesonics fees, he voiced no objection to a 1% interest." Id. at 10. In doing so, Sufrin "effectively deprived Hosier of the opportunity to take protective action." Id. at 9. Consequently, Hosier argues that, because of "the prejudice to [him] resulting from Sufrin's silence and later acceptance of benefits," Sufrin should be estopped from bringing his claim. Id. at 10.
The Saverslak court stated that "[e]stoppel ... focuses not on the obligor's intent, but rather on the effects of his conduct on the obligee." 606 F.2d at 213. "An estoppel ... arises only when a party's conduct misleads another to believe that a right will not be enforced and causes him to act to his detriment in reliance upon this belief." Id.
In this case, the facts proven are insufficient to establish that Sufrin misled Hosier to believe that he would not enforce a right under the Agreement. Again, it is unclear whether the Telesonics payout arose under the Agreement. Suf.Dep. at 40. If it did not, Sufrin's acceptance of the payout did not mislead Hosier to believe that Sufrin would not enforce a right. We need not reach the second part of estoppel analysis, whether Sufrin's alleged misleading conduct caused Hosier to act to his detriment. Therefore, Hosier's argument is unpersuasive.
Hosier's arguments and defenses are unpersuasive. Therefore, as in Ellerby, the fees should be divided pursuant to "the distribution formula in effect at the time of the dissolution." 138 Ill.App.3d at 83, 92 Ill.Dec. 602, 485 N.E.2d 413. The Agreement governs the entitlement.

C. Is Summary Judgment Appropriate?
The parties contest the breadth of the Agreement's phrase "residual profits." Sufrin argues that the phrase includes H & S's contingent fee recoveries. Hosier argues that it excludes such recoveries. Given such a contest, summary judgment is inappropriate. Banque Paribas v. Hamilton Indus. Int'l, Inc., 767 F.2d 380, 383 (7th Cir.1985). To answer our original question: At this point, it is unclear who is entitled to what amount of the contingent fees.

III. Conclusion
For the reasons discussed above, we deny Hosier's motion in limine and his alternative motion for summary judgment.
NOTES
[1] On February 13, 1987, Hosier and Sufrin modified the formula such that, effective March 1, 1987, Sufrin would receive 90% of billings. Pl.'s Br. at Ex. F.
[2] We simplify this case by limiting the parties to Fox and his former firm.
[3] In relevant part, Rule 2-107 provides: "A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm."